IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2008

## STATE OF TENNESSEE v. JESSE WADE GLOVER

**Direct Appeal from the Circuit Court for Obion County**
**No. C07-161     William B. Acree, Jr., Judge**

---

**No. W2008-00185-CCA-R3-CD - Filed July 13, 2009**

---

Defendant, Jesse Wade Glover, was indicted in count one for initiation of a process to manufacture methamphetamine by beginning the extraction of an immediate methamphetamine precursor from a chemical product, a Class B felony, in count two for promotion of methamphetamine manufacture by possessing more than 9 grams of an immediate methamphetamine precursor with the intent to manufacture methamphetamine, a Class D felony; in count three for promotion of methamphetamine manufacture by acquiring a chemical and an ingredient that could be used to produce methamphetamine knowing that it would be used to produce methamphetamine, a Class D felony; and in count four for possession of drug paraphernalia, a Class A misdemeanor. Defendant was tried jointly with co-defendant, Britt Alan Ferguson. Co-defendant Ferguson's case is not part of this appeal. Following a jury trial, Defendant was found not guilty of the charges in counts one, two, and four, and guilty of the lesser-included offense of facilitation of the promotion of methamphetamine manufacture, a Class E felony, in count three. The trial court sentenced Defendant as a Range II, multiple offender, to four years. On appeal, Defendant argues that the evidence was insufficient to support his conviction of facilitation of promotion of methamphetamine manufacture. After a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Joseph P. Atnip, District Public Defender, Dresden, Tennessee, for the appellant, Jesse Wade Glover.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and Jim T. Cannon, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## I. Background

Jody Emery, a friend of both Defendant and Mr. Ferguson, testified that on February 22, 2007, police officers from the Union City Police Department and the 27th Judicial District Drug Task Force arrived at his residence and informed Mr. Emery that they had received a tip from Crime Stoppers that Mr. Emery was manufacturing methamphetamine. Mr. Emery consented to a search of his residence and vehicles. Mr. Emery stated that on the night before the search, on February 21, 2007, he, Defendant, and Mr. Ferguson used methamphetamine at a gathering at Mr. Emery's house. Mr. Emery said that Mr. Ferguson asked Mr. Emery if he "could get any anhydrous [ammonia]," and Mr. Emery told him, "No." Mr. Emery stated that Mr. Ferguson said that he had some pills and thought he could manufacture methamphetamine. Mr. Emery stated that Defendant was present and overheard this conversation.

Mr. Emery thought that Mr. Ferguson was the informant whose tip led to the search of his residence and vehicles. Mr. Emery called Mr. Ferguson during the search and told him that police officers were searching his home. Mr. Emery asked Mr. Ferguson if he was still "going to cook some dope." Mr. Emery said that Mr. Ferguson "just mumbled, 'Yeah, if he could.'" Mr. Emery reported the substance of his telephone conversation with Mr. Ferguson to the police officers.

On cross-examination, Mr. Emery acknowledged that the police officers were standing next to him while he placed the telephone call to Mr. Ferguson, but he stated that he offered to call Mr. Ferguson. Mr. Emery said that Mr. Ferguson had not told Mr. Emery when or where he was going to manufacture methamphetamine.

Investigator Derrick O'Dell, with the Union City Police Department, testified that on February 22, 2007, at approximately 3:00 p.m., he received a telephone call from Crime Stoppers that there was an active methamphetamine laboratory at Mr. Emery's residence. Investigator O'Dell, Investigator Shawn Palmer, and Investigator David Crocker approached Mr. Emery, and Mr. Emery consented to a search of his residence and vehicles. Investigator O'Dell stated that the search revealed no incriminating evidence. After Mr. Emery's telephone conversation with Mr. Ferguson, the investigating officers drove to Mr. Ferguson's residence.

Investigator O'Dell said that as he approached Mr. Ferguson's residence, he observed Mr. Ferguson and Defendant standing beside a blue Chevrolet pick-up truck equipped with a lift kit. Mr. Ferguson was outside the vehicle holding a floor mat and a whisk broom. When the two men spotted Investigator O'Dell's vehicle, they walked to the front of the truck. Investigator O'Dell could only see the men's heads and the lower portion of their legs. Investigator O'Dell stated that he observed a white object fall to the ground between Defendant and Mr. Ferguson. Investigator O'Dell said that Mr. Ferguson and Defendant had what appeared to be a heated conversation for approximately five seconds, and then Mr. Ferguson bent down and picked up the white object. Investigator O'Dell said

that Mr. Ferguson walked around to the truck's right passenger side and placed the object in the vehicle's wheel well.

Investigator O'Dell got out of his vehicle, approached Mr. Ferguson, and asked him to step away from the truck. Investigator O'Dell retrieved a plastic bag from the wheel well which contained a crushed white substance in a plastic bag and five lithium batteries. Investigator O'Dell placed Mr. Ferguson under arrest, advised him of his Miranda rights, and conducted a search of his person. Investigator O'Dell said that he discovered a pair of wire cutters, a flat-bladed tool, and a pair of latex gloves in Mr. Ferguson's pocket. Investigator O'Dell said that a half-empty gallon jug of Coleman camping fuel was found in the bed of the truck. Investigator O'Dell said that Mr. Ferguson told him that the crushed pills in the plastic bag belonged to Mr. Emery. Investigator O'Dell stated that Defendant was also placed under arrest but no incriminating evidence was found on his person.

On cross-examination, Investigator O'Dell said that Barbie Sharp, Mr. Ferguson's girlfriend, a juvenile male, and Angela Parish were sitting inside the blue truck when he arrived at Mr. Ferguson's residence. Investigator O'Dell said that he did not know who crushed the pills that were discovered in the plastic bag in the truck's wheel well. Investigator O'Dell said that the blue truck belonged to Defendant. Investigator O'Dell acknowledged that he did not test the Coleman fuel can for fingerprints.

Dana Parmenter, a special agent forensic scientist with the Tennessee Bureau of Investigation (T.B.I.), testified that she tested the white substance found in the plastic bag and determined it to be 89.7 grams of a powder that contained ephedrine or pseudoephedrine. Special Agent Parmenter said that the instruments used in testing did not distinguish between the two ingredients, but both ephedrine and pseudoephedrine are precursor ingredients for the manufacture of methamphetamine. On cross-examination, Special Agent Parmenter stated that she could not discern from her tests whether the white powdered substance contained ingredients other than ephedrine or pseudoephedrine.

Investigator Shawn Palmer, with the Union City Police Department, testified that he is assigned to the 27th Judicial District Drug Task Force. Investigator Palmer explained that there were several ways to manufacture methamphetamine, but one method, the anhydrous method, was more commonly used in West Tennessee. In this process, anhydrous ammonia, lithium metal which is usually extracted from batteries, and crushed pills containing pseudoephedrine are mixed together and covered with a fluid such as Colman's camping fuel. The mixture is allowed to set for a period of time, after which the ephedrine component separates from the other substances in the commercial products and is suspended in the liquid. Investigator Palmer stated that latex or rubber gloves are worn during the process to protect the skin from chemical burns, and a pair of wire cutters can be used to extract the ribbon of lithium metal from batteries. On cross-examination, Investigator Palmer stated that the ephedrine or pseudoephedrine had not yet been extracted from the white powdered substance found in the bag.

The State rested its case-in-chief, and Mr. Ferguson put on his defense. Mr. Ferguson testified that when Investigator O'Dell drove up to his residence, he was standing at the passenger side door of Defendant's truck, sweeping a floor mat. Mr. Ferguson said that he held the broom in his right hand and the floor mat in his left hand. One of the women in the truck said that police officers were approaching the residence, and Mr. Ferguson responded, "So what. We've done nothing wrong." Mr. Ferguson stated that Defendant dropped the package containing the crushed pseudoephedrine pills to the ground. Mr. Ferguson told Defendant to pick up the package. Defendant told him that the substance belonged to Mr. Emery, and that he did not want to pick the package up because he had some prior convictions. Mr. Ferguson said that Defendant later told him that the substance was his and that if they went to trial, Defendant would take responsibility for possessing the substance.

On cross-examination, Mr. Ferguson said that he had assumed that the white powdered substance that Defendant dropped was an illegal substance, but he did not know for sure. Mr. Ferguson acknowledged that he picked up the package, but he denied that he hid it. Mr. Ferguson said that he simply put the package back into Defendant's truck. Mr. Ferguson said that the wire cutters were in his pocket because he had been working on his fuel pump, and the flat-bladed tool was used to open boxes. Mr. Ferguson acknowledged that he visited Defendant's father, Neil Glover, after he was released on bond, but he denied telling Mr. Glover that Defendant did not have anything to do with the offenses.

Mr. Ferguson said that he and Defendant had run into Mr. Emery before the investigating officers arrived at Mr. Ferguson's residence, and Mr. Emery told Defendant to get rid of his companions because he and Defendant had something to do. Mr. Ferguson denied that he had used methamphetamine the night before at Mr. Emery's house. Mr. Ferguson denied that he told Mr. Emery that he had some anhydrous ammonia. Mr. Ferguson said that when Mr. Emery called him on February 22, 2007, Mr. Emery did not mention anything about manufacturing methamphetamine. Mr. Ferguson acknowledged that Mr. Emery told him that the police officers were searching his shed, but he said that Mr. Emery did not tell him that the officers were coming to his house.

Barbie Sharp testified that she was sitting in the cab of Defendant's truck when the police officers arrived at Mr. Ferguson's house. Ms. Sharp said that the truck's passenger side door was open. Ms. Sharp overheard Defendant's and Mr. Ferguson's argument over the package containing the white powdered substance. Ms. Sharp said that Mr. Ferguson asked Defendant to pick up the package, and Defendant told Mr. Ferguson that the package belonged to Mr. Emery. On cross-examination, Ms. Sharp said that she lived with Mr. Ferguson, and the couple had a young son. Ms. Sharp acknowledged that she and Mr. Ferguson discussed the events of that day. Ms. Sharp asked Mr. Ferguson why he picked up the package, and Mr. Ferguson told her that he "just panicked."

Defendant put on his defense. Defendant testified that on February 21, 2007, he went over to Mr. Ferguson's house, and then the two of them went to Mr. Emery's house where they talked and used drugs. The next day, February 22, 2007, Defendant, Mr. Ferguson, Ms. Sharp, and Ms. Parrish went to Defendant's father's farm to help clean out the machine shop. Defendant said that his father

-4-

stored numerous items in the shop including Mr. Glover's camping supplies. Defendant testified that there were periods of time during the afternoon when he and Mr. Ferguson were not together.

Defendant said that the group returned to Mr. Ferguson's house after they had finished cleaning the machine shop. They were there approximately ten minutes when the police officers arrived. Defendant said that he saw Mr. Ferguson take something out of his pocket and try to put it between the hood of the truck and the windshield wipers. Defendant asked Mr. Ferguson what he was doing. Defendant walked around to the front of the truck and saw the package lying on the ground. Defendant said that Mr. Ferguson picked up the package and put it in the truck's wheel well. Defendant denied that he told Mr. Ferguson that he could not pick up the package because he had prior convictions. Defendant noticed the camping fuel in the truck bed before the police found it, but Defendant stated that he did not know who had placed it there. Defendant said that the camping fuel was not in his truck when he and Mr. Ferguson went to his father's place to clean out the machine shop. Defendant said that Mr. Ferguson later told Defendant's father that Defendant did not have anything to do with the charged offenses.

Neil Glover, Defendant's father, testified that Defendant and Mr. Ferguson, along with two women, came to clean out Mr. Glover's machine shop one day. Mr. Glover said that he had a lot of camping equipment, including Coleman lanterns. Mr. Glover said that he had bought Coleman camping fuel on several occasions in the past. Mr. Glover said that at some point after he was arrested, Mr. Ferguson came to his farm with various items to sell. Mr. Ferguson told Mr. Glover that he was trying to raise money to hire an attorney. Mr. Ferguson assured Mr. Glover that Defendant was not involved with the offense.

On cross-examination, Mr. Glover said that he could not specifically remember when he had last purchased Coleman camping fuel, and he could not say with certainty that there was any camping fuel in the machine shop on February 22, 2007.

Investigator O'Dell was called as a rebuttal witness. Investigator O'Dell testified that Defendant told Investigator O'Dell that he knew that the camping fuel was in the back of his truck, but Defendant could not further explain its presence.

## II. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support his conviction of facilitation of the promotion of the production of methamphetamine. Specifically, Defendant questions the credibility of Mr. Ferguson's and Ms. Sharp's testimony as to Defendant's role in the offenses, and submits that the State failed to prove that he had placed the Coleman camping fuel in his vehicle or that he knew that Mr. Ferguson intended to manufacture methamphetamine.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v.

Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Defendant was convicted of the facilitation of the promotion of methamphetamine manufacture. Facilitation occurs when a person, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), . . . knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a). The felony in the instant case is the promotion of methamphetamine manufacture which is defined, as relevant here, as the acquisition of any "chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use." Id. § 39-17-433(a)(1). In count three of the indictment, Defendant was charged with acquiring a "chemical and an ingredient." It appears from the record that the chemical and ingredient encompassed by count three was the Coleman camping fuel.

Viewing the evidence in a light most favorable to the State, Mr. Emery testified that he, Defendant and Mr. Ferguson used methamphetamine the night before Defendant and Mr. Ferguson were arrested. Mr. Emery stated that Mr. Ferguson asked Mr. Emery if he had any anhydrous ammonia. Mr. Ferguson said that he had some pills and thought he could manufacture methamphetamine. Mr. Emery testified that Defendant was present and overheard this conversation.

The next day, investigators from the Union City Police Department and the 27th Judicial District Drug Task Force arrived at Mr. Ferguson's residence. Investigator O'Dell observed a plastic bag containing a white powdered substance and five lithium batteries fall to the ground between Defendant's and Mr. Ferguson's legs. Defendant and Mr. Ferguson had a heated conversation about the dropped package, and then Mr. Ferguson picked up the package and placed it in the wheel well of Defendant's truck. The powdered substance was later determined to be 89.7 grams of a powder that contained ephedrine or pseudoephedrine. A search of Mr. Ferguson's person also revealed wire cutters and latex gloves. Mr. Glover testified that he had numerous camping supplies at his residence, including Coleman lanterns, and that he had bought Coleman camping fuel on several occasions. Defendant and Mr. Ferguson visited Mr. Glover on February 22, 2007, and then returned to Mr. Ferguson's home. A half-empty gallon can of Coleman camping fuel was discovered by the investigating offers in the bed of Defendant's truck after they arrested Defendant and Mr. Ferguson later that day.

Investigator Palmer testified that the anhydrous method of manufacturing methamphetamine was most commonly used in West Tennessee. Investigator Palmer stated that the ingredients necessary for the manufacturing process included anhydrous ammonia, lithium metal, and crushed pills containing pseudoephedrine. Investigator Palmer said that lithium can be extracted from lithium batteries by use of a tool such as a pair of wire cutters. Investigator Palmer said that the anhydrous ammonia, lithium, and crushed pills are mixed together and then covered with a fluid such as Coleman's camping fuel in order to extract the ephedrine component from the pills.

As Defendant points out, there were numerous conflicts between his and Mr. Ferguson's trial testimony, but such conflicts and inconsistencies, and the witnesses's credibility are left to the jury for resolution. Based on our review of the record, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant knew that Mr. Ferguson planned to manufacture methamphetamine, and that Defendant knowingly furnished substantial assistance by possessing at least one of the ingredients, the Coleman camping fuel, which was necessary to accomplish the manufacturing process. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE